Filed 11/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN LUIS BELLOSO,<br><br>    Defendant and Appellant. | B290968<br><br>(Los Angeles County<br>Super. Ct. No. VA147067) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Michael A. Cowell, Judge. Affirmed; remanded with instructions.

    Dawn S. Mortazavi, under appointment by the Court of Appeal, for Defendant and Appellant.

    Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Juan Luis Belloso appeals from a judgment entered after the jury convicted him of carrying a concealed dirk or dagger (Pen. Code,[1] § 21310).  Belloso contends there is insufficient evidence to establish his stainless steel knife with a four-inch fixed blade was a dirk or dagger.  Belloso also contends the trial court violated his rights to due process and equal protection under the Fourteenth Amendment by failing to consider his ability to pay before imposing court assessments and restitution fines, relying on this court's opinion in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).[2]

We recognize there is a split in authority as to whether *Dueñas* was correctly decided.  Although several Courts of Appeal have adopted our due process analysis, others have concluded *Dueñas* was wrongly decided or that an Eighth Amendment analysis under the excessive fines clause is doctrinally preferable.  We find unpersuasive the analyses of the courts that have disagreed with *Dueñas*, as exemplified by the two most recent cases rejecting this court's due process analysis, *People v. Hicks* (2019) 40 Cal.App.5th 320, 326 (*Hicks*) and *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1061 (*Aviles*).  The Supreme Court is now poised to resolve this split in authority, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96 (*Kopp*), review

_____

[1]     Further undesignated statutory references are to the Penal Code.

[2]     Belloso also contends the abstract of judgment incorrectly reflects Belloso was convicted after a plea, not by a jury.  However, on September 28, 2018 the trial court corrected the abstract of judgment at the request of Belloso's appellate counsel.

2

granted November 13, 2019, S257844,[3] which applied the *Dueñas* due process analysis to imposition of the court assessments and an Eighth Amendment analysis to the restitution fines. We reaffirm this court's holding in *Dueñas*. We also disagree an excessive fines analysis under the Eighth Amendment is preferable or would lead to a different result. We remand for the trial court to allow Belloso to request a hearing and present evidence demonstrating his inability to pay the court assessments and fines imposed by the court. We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Information*

The information charged Belloso with carrying a concealed dirk or dagger in violation of section 21310. The information alleged Belloso suffered three prior convictions of a violent or serious felony under the three strikes law (§§ 667, subds. (b)-(j), 1170.12), including a 1995 conviction of assault in violation of section 245, subdivision (a)(1), and 2013 convictions of assault in violation of section 245, subdivision (a)(1), and making a criminal threat in violation of section 422. The information also alleged five prior felony convictions for which Belloso served separate prison terms within the meaning of section 667.5, subdivision (b).

---

[3]    The Supreme Court granted review of *Kopp* limited to the following issues: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?"

3

Belloso pleaded not guilty and denied the special allegations.

B. *The Evidence at Trial*

On the evening of February 20, 2018 Los Angeles County Sheriff's Deputy Scott Simpkins and his partner were on patrol in an unmarked black SUV in the City of Lakewood.  Deputy Simpkins was driving northbound on Woodruff Avenue when he observed Belloso about 50 feet away walking in the same direction on the sidewalk.  The area was illuminated well by street lights and lights from the surrounding buildings.  According to Deputy Simpkins, Belloso "was walking very ridged, kind of very upright.  He was very rapid in his movements and he was constantly turning around, looking around nervously.  There was [nobody] else around him."

Deputy Simpkins pulled the SUV alongside the curb, within 15 feet of Belloso.  As the vehicle came to a stop, Belloso reached into his front right pocket with his right hand and pulled out a long, fixed-bladed knife.  Belloso held the knife with his right hand, keeping it low by his side.  As Deputy Simpkins exited his vehicle and approached, Belloso dropped the knife, stepped to the side, and got down on his knees.  Deputy Simpkins detained Belloso.  Belloso stated he was carrying the knife because he was not from the area and was "sketched out."  Deputy Simpkins interpreted this to mean Belloso had the knife for protection.  Deputy Simpkins recovered the knife from the ground and booked it into evidence.

Deputy Simpkins brought the knife in an envelope to court to show the jury.  The knife was covered by a piece of thick paper, secured by rubber bands.  Deputy Simpkins explained, "It's

wrapped like this so the person does not cut themselves." He described the knife as a stainless steel knife, measuring eight to nine inches, with a four- to four-and-a-half-inch fixed blade, which could not be folded. The jury was shown a photograph of the knife taken by Deputy Simpkins as part of the booking process.[4] The photograph shows the blade is curved on one side and straight on the other, with a pointed tip on the end.

Belloso did not call any witnesses.

C.    *The Verdict and Sentencing*

The jury found Belloso guilty of carrying a dirk or dagger, in violation of section 21310. On the day of sentencing, Belloso admitted the special allegation he suffered a 2013 conviction of making a criminal threat under section 422, which was a violent or serious felony conviction under the three strikes law. Belloso also admitted the special allegation he suffered five prior felony convictions for which he served separate prison terms within the meaning of section 667.5, subdivision (b). The trial court accepted the pleas and found the special allegations were true. At Belloso's request, the court struck the allegations of the 1995 prior strike conviction and the five prison priors.[5]

---

[4]    The trial court later admitted the photograph into evidence.

[5]    Belloso did not admit the special allegation his 1995 assault conviction was of a violent or serious felony under the three strikes law. The record does not reflect whether Belloso's 1995 conviction was of an assault with a deadly weapon or by force likely to produce great bodily injury, only the former of which is a violent or serious felony under the three strikes law. (See § 1192.7, subd. (c)(31) [assault with a deadly weapon listed as serious felony].) Nor did Belloso admit the alleged 2013

The trial court sentenced Belloso to an aggregate term of six years, comprised of the upper term of three years (§§ 21310 & 1170, subd. (h)(1)) doubled under the three strikes law. The court imposed a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) and a $40 court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)). The court also imposed the statutory minimum restitution fine of $300 (§ 1202.4, subd. (b)(1)), and it imposed and suspended a parole revocation restitution fine in the same amount (§ 1202.45). Belloso did not object to imposition of the assessments and fines or raise his inability to pay.

Belloso timely appealed.

## DISCUSSION

A.   *Substantial Evidence Supports Belloso's Conviction of Carrying a Concealed Dirk or Dagger*

1.   *Standard of review*

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the

---

conviction of assault with a deadly weapon (§ 245, subd. (a)(1)). On our own motion we augment the record to include the June 27, 2018 minute order. (Cal. Rules of Court, rule 8.155(a)(1)(A).) The June 27 minute order states Belloso "admits the [sections] 1170.12 and 667[, subdivisions] (b)-(i) Penal Code allegations which the court finds to be true." On remand the trial court should correct the minute order to reflect Belloso only admitted the allegation he was convicted of a violent or serious felony under the three strikes law with respect to the 2013 conviction of making a criminal threat, not the 1995 or 2013 assault convictions.

6

judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].) "'The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.' [Citations.] 'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*Westerfield*, at p. 713; accord, *Penunuri*, at p. 142 ["'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'"].)

      2.    *Substantial evidence supports the jury's finding Belloso's knife was a dirk or dagger*

"[S]ection 21310 makes it a criminal offense to carry 'concealed upon the person any dirk or dagger.'" (*People v. Castillolopez* (2016) 63 Cal.4th 322, 327; see § 21310 ["any person in this state who carries concealed upon the person any dirk or dagger" commits a criminal offense punishable as a felony or misdemeanor].) Section 16470 defines a dirk or dagger as "a

knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death."

"[T]he legislative history is clear and unequivocal: the intent to use the concealed instrument as a stabbing instrument is *not* an element of the crime of carrying a concealed dirk or dagger." (*People v. Rubalcava* (2000) 23 Cal.4th 322, 331; accord, *Stark v. Superior Court* (2011) 52 Cal.4th 368, 394-395.) However, a defendant must know the concealed instrument could readily be used as a stabbing weapon. (*Rubalcava*, at p. 332 ["[T]o commit the offense, a defendant must still have the requisite *guilty mind*: that is, the defendant must knowingly and intentionally carry concealed upon his or her person an instrument 'that is capable of ready use as stabbing weapon.'"]; see CALCRIM No. 2501 ["To prove that the defendant is guilty of this crime, the People must prove that: [¶] . . . [¶] 4. The defendant knew that it could readily be used as a stabbing weapon."].) Whether a knife is a dirk or dagger is a question of fact for the jury to determine. (*People v. Bain* (1971) 5 Cal.3d 839, 851; *People v. Wharton* (1992) 5 Cal.App.4th 72, 76 (*Wharton*).)

Belloso contends there is insufficient evidence to support the jury's finding his knife was a dirk or dagger. He admits Deputy Simpkins testified the stainless steel knife had a four-inch fixed blade and was wrapped in paper to prevent it from cutting someone. But Belloso argues Deputy Simpkins did not testify about the characteristics of the knife, including whether it was sharp or dull; whether it had a pointed or rounded edge; or whether the fixed blade was rigid or flexible. He also claims the photograph did not show these characteristics. Further, Belloso

8

asserts the fact the knife was wrapped during trial to prevent it from cutting someone did not mean the knife had the ability to cause great bodily injury or death.

Contrary to Belloso's contentions, substantial evidence supported the jury's finding the knife could readily be used as a stabbing weapon. The jury observed the knife at trial, and the photograph of the knife was admitted into evidence. Deputy Simpkins testified the stainless steel knife measured eight to nine inches long, with a four- to four-and-a-half-inch fixed blade. The knife's blade could not be folded, unlike a pocket knife. The photograph of the knife showed it had a sharp point. Deputy Simpkins explained the knife was wrapped in paper to prevent cuts from handling the knife. The jury could have reasonably inferred from Deputy Simpkins's testimony the knife was sharp; otherwise, it would not have posed a risk of cutting someone. In addition, Deputy Simpkins testified Belloso was carrying the knife for protection, in light of Belloso's comments he was carrying the knife because he was "sketched out" and not from the area. The jury could have reasonably inferred Belloso would not have carried a dull, rounded-tip knife for protection.

The evidence the knife was stainless steel, with a fixed four-inch blade, a sharpened edge, and pointed tip, and it was carried by Belloso for protection, support the jury's finding the knife was "capable of ready use as a stabbing weapon that may inflict great bodily injury or death." (§ 16470; see *Wharton, supra*, 5 Cal.App.4th at p. 76 [knife with three-and-a-half-inch blade that was rigid, sharpened on both sides, and had a sharp point was dirk or dagger]; *In re Quintus W.* (1981) 120 Cal.App.3d 640, 642, 645 (*Quintus W.*) [steak knife with four-and-five-eighths-inch blade was dirk or dagger]; *People v. Ferguson* (1970)

7 Cal.App.3d 13, 18-19 (*Ferguson*) [kitchen knife with eight-inch blade, one cutting edge, and a point was dirk or dagger]; cf. *People v. Barrios* (1992) 7 Cal.App.4th 501, 506 (*Barrios*) [bread knife was not dirk or dagger because the knife's four-inch blade had "one dull serrated edge and one blunt edge," with a rounded modest tip only on the serrated edge, and the blade flexed when the point was applied to an object].)[6]

B.    *Belloso Is Entitled to a Hearing on His Ability To Pay the Assessments and Fines*

Belloso requests we remand the case for the trial court to conduct an ability-to-pay hearing in accordance with this court's opinion in *Dueñas* because he was indigent at the time of sentencing. We agree Belloso should have an opportunity on remand to request a hearing and present evidence demonstrating his inability to pay the assessments and the statutory minimum restitution and parole revocation fines.

---

[6]    *Wharton*, *Quintus W.*, *Ferguson*, and *Barrios* were decided before the 1993 and 1995 amendments to former section 12020, now codified at section 16470, which provided a statutory definition of a dirk or dagger to clarify that a knife qualified as a dirk or dagger regardless of whether it had a handguard or the defendant intended to use it as a stabbing weapon. (*People v. Castillolopez, supra*, 63 Cal.4th at p. 328; *People v. Rubalcava, supra*, 23 Cal.4th at p. 330.) This change in the law does not affect our analysis.

1. *Imposition of the assessments and fines violated Belloso's due process rights*

In *Dueñas, supra*, 30 Cal.App.5th at page 1168, this court concluded "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution." As this court noted, the court assessments, which must be imposed on every criminal conviction, were enacted as part of legislation to raise funds for California courts, not to impose punishment on the defendant. (*Dueñas*, at pp. 1164-1165.)

In contrast to the assessments, a restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime." (*Dueñas, supra*, 30 Cal.App.5th at pp. 1165, 1169.) Section 1202.4, subdivision (c), provides a defendant's inability to pay may not be considered a "compelling and extraordinary reason" not to impose the restitution fine; rather, inability to pay may be considered only when increasing the amount of the restitution fine above the minimum required by statute.

As this court held in *Dueñas*, to avoid the serious constitutional question raised by imposition of the restitution fines on an indigent defendant, "although the trial court is required by . . . section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay the fine." (*Dueñas, supra*, 30 Cal.App.5th at p. 1172.) Otherwise,

11

unpaid restitution fines would later be enforceable as a civil judgment, which could be collected by the State as an offset against any amount a state agency owes a defendant, including tax refunds. (*Id*. at pp. 1169-1170.) Further, a defendant granted probation who does not have the ability to pay the restitution fine would be unable to fulfill the conditions of probation, and as a result, "through no fault of his or her own he or she [would be] categorically barred from earning the right to have his or her charges dropped and to relief from the penalties and disabilities of the offense for which he or she has been on probation, no matter how completely he or she complies with every other condition of his or her probation." (*Id*. at pp. 1170-1171, citing § 1203.4, subd. (a)(1).)

Although several Courts of Appeal have applied this court's analysis in *Dueñas* (e.g., *People v. Santos* (2019) 38 Cal.App.5th 923, 929-934 [following *Dueñas* and declining to find forfeiture]); *Kopp, supra*, 38 Cal.App.5th at pp. 95-96 [applying *Dueñas* to court assessments]; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030-1035 [following *Dueñas* but concluding error was harmless]), others have rejected the due process analysis (e.g., *People v. Kingston* (2019) 41 Cal.App.5th 272, 279-281; *Hicks, supra*, 40 Cal.App.5th at p. 326), or concluded the imposition of fines and fees should be analyzed under the excessive fines clause of the Eighth Amendment (e.g., *Aviles, supra*, 39 Cal.App.5th at p. 1061; *Kopp*, at pp. 96-97 [applying excessive fines analysis to restitution fines]). Although there is some variation in how the Courts of Appeal have approached *Dueñas*, we focus our discussion on the more extensive analyses in *Hicks* and *Aviles*. We find their reasoning unpersuasive and affirm this court's due process analysis in *Dueñas*.

a.     *Imposing fines and assessments on indigent defendants violates due process*

In *Hicks,* Division Two of this district analyzed the precedent this court relied on in *Dueñas* as two separate due process strands, finding neither supported the conclusion that imposition of fines and assessments upon an indigent defendant without an ability-to-pay determination violated his or her due process rights.  (*Hicks, supra*, 40 Cal.App.5th at p. 326.)  *Hicks* concluded *Griffin v. Illinois* (1956) 351 U.S. 12 (*Griffin*) and *Mayer v. City of Chicago* (1971) 404 U.S. 189 were inapplicable because they provided for "a due process-based right of *access* to the courts."  (*Hicks*, at p. 325.)  *Hicks* reasoned the imposition of fines and fees on indigent defendants after trial, unlike the requirement in *Griffin* and *Mayer* that defendants pay for a transcript to obtain appellate review of their convictions, does not interfere with a "defendant's right to present a defense at trial or to challenge the trial court's rulings on appeal."  (*Hicks*, at p. 326.)

The court in *Hicks* reads the precedent on which *Dueñas* relied too narrowly.  This court in *Dueñas* recognized as a basic principle of fairness that the rich and poor should have equal access to the justice system, consistent with the principle underlying the holding in *Griffin, supra*, 351 U.S. at page 17, that "all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'"  The United States Supreme Court affirmed this principle in *Mayer v. City of Chicago, supra*, 404 U.S. at pages 196-198, which held a defendant's inability to pay for a transcript to appeal a conviction that resulted in imposition of a

13

fine violated the defendant's due process rights.  The Supreme Court explained, "The invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed."  (*Id.* at p. 197.)

Without an ability-to-pay determination, the consequences to a defendant from imposition of an assessment or fine differ solely because of his or her financial condition.  As this court observed in *Dueñas*, collection of unpaid assessments could damage the defendant's credit, potentially interfere with child support obligations, restrict employment opportunities, and otherwise impact the defendant's reentry to society and rehabilitation.  (*Dueñas, supra*, 30 Cal.App.5th at p. 1168.) These consequences are particularly troubling as to the assessments because they are imposed not as a punishment, but to fund the court system.  (*Id.* at p. 1165.)  As discussed, failure to pay the restitution fine could similarly result in serious consequences, including preventing a defendant from obtaining dismissal of his or her conviction and enforcement of a civil judgment against the defendant.  (*Id.* at p. 1170.)  In light of these differing consequences, under *Griffin*, there is no "'equality before the bar of justice.'"  (*Griffin, supra*, 351 U.S. at p. 17.) *Hicks* fails to acknowledge these severe impacts.

As to the second due process strand—the bar on incarceration of an indigent defendant for failure to pay fines, as articulated in *In re Antazo* (1970) 3 Cal.3d 100, 103-104 (*Antazo*), *Bearden v. Georgia* (1983) 461 U.S. 660, 661-662 (*Bearden*), and *Williams. v. Illinois* (1970) 399 U.S. 235, 241 (*Williams*)—*Hicks* concluded these cases do not support an ability-to-pay hearing for fines and fees in the *Dueñas* context because a defendant's failure

14

to pay would not result in imprisonment. (*Hicks, supra*, 40 Cal.App.5th at p. 327.) The court in *Hicks* also found *Dueñas* was inconsistent with the purpose of probation to rehabilitate defendants by requiring repayment of their debts and amounted to "'inverse discrimination'" against affluent defendants by allowing indigent defendants to avoid paying the fines and fees. (*Hicks*, at p. 327.)

This court fully considered and addressed the issues raised by *Hicks* in *Dueñas*. The due process analyses in *Antazo*, *Bearden*, and *Williams* are not limited to situations where a defendant faces imprisonment because of an inability to pay an assessment or fine. As the California Supreme Court held in *Antazo*, in finding imprisonment of the defendant for failure to pay a fine violated his equal protection rights, "We are satisfied that in the case at bench, . . . we are presented with an example of discrimination between different groups or classifications of convicted criminal defendants—those who are poor and those who are not—or, to put it another way, of discrimination based upon poverty."[7] (*Antazo, supra*, 3 Cal.3d at p. 112; see *Bearden,*

---

[7] Although *Antazo*, *Bearden*, and *Williams* address both due process and equal protection principles, in *Dueñas* this court considered "the issue one of due process because it concerns the fairness of relations between the criminal defendant and the state." (*Dueñas, supra*, 30 Cal.App.5th at p. 1168, fn. 4; see *Bearden, supra*, 461 U.S. at p. 665 ["[W]e generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question where the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause."].)

15

*supra*, 461 U.S. at pp. 668-669, fn. omitted ["[I]f the probationer has made all reasonable efforts to pay the fine or restitution, and yet cannot do so through no fault of his own, it is fundamentally unfair to revoke probation automatically without considering whether adequate alternative methods of punishing the defendant are available."]; *Williams, supra*, 399 U.S. at p. 242 ["By making the maximum confinement contingent upon one's ability to pay, the State has visited different consequences on two categories of persons . . . ."].) A defendant who does not pay fines or fees faces potentially severe consequences that punish him or her based on poverty, not the underlying crime.

The court in *Hicks* focused on the language in *Antazo* that imposition of penalty assessments on indigent defendants would not "'constitute[] of necessity in all instances a violation of the equal protection clause.'" (*Hicks, supra*, 40 Cal.App.5th at p. 327, quoting *Antazo, supra*, 3 Cal.3d at p. 116.) On this basis the *Hicks* court concluded *Dueñas*'s requirement of an across-the-board hearing on a defendant's ability to pay "prohibits a practice that *Antazo* sanctioned." (*Hicks*, at p. 327.) But *Antazo* never sanctioned imposition of consequences on an indigent defendant different from those imposed on a defendant with resources to pay. Rather, as the *Antazo* court explained, "Depending upon the circumstances of the particular case and the condition of the individual offender, there are a variety of ways in which the state may fine the indigent offender, as alternatives to imprisonment, without offending the command of equal protection." (*Antazo*, at p. 116.) The United States Supreme Court in *Bearden* observed, for example, "the sentencing court could extend the time for making payments, or reduce the fine, or direct that the probationer perform some form of labor or public service in lieu of

16

the fine." (*Bearden, supra*, 461 U.S. at p. 672.) As the *Bearden* court explained, these feasible alternatives would serve the state's goals of punishment and deterrence without "depriv[ing] the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine." (*Ibid.*)

Moreover, the reasoning in *Hicks* that imposition of fines and assessments is necessary for punishment does not apply to court assessments because they are not intended as a form of punishment. As to the restitution fine, requiring all defendants to pay the same minimum restitution fine as a form of punishment does not address the constitutional infirmity of imposing the fine on defendants lacking the ability to pay. We are mindful of the concern in *Hicks* that requiring an ability-to-pay hearing for assessment fees and restitution fines would have a deleterious impact on court funding and the statewide restitution fund, respectively. (*Hicks, supra*, 40 Cal.App.5th at p. 329.) But that concern does not address the constitutionality of seeking to fund the courts and the state restitution fund by imposing fees and assessments on those who cannot pay.[8]

---

[8] Courts have distinguished between direct victim restitution that reimburses victims for economic losses caused by a defendant's conduct and the restitution fine imposed to punish the defendant. (See, e.g., *People v. Evans* (2019) 39 Cal.App.5th 771, 777 ["Based on the significant differences in purpose and effect between victim restitution and the moneys at issue in *Dueñas*, we decline to extend the rule of *Dueñas* to victim restitution."].) We do not address direct victim restitution in this appeal. We note, however, that although a defendant's ability to pay may not be considered in determining the amount of direct victim restitution (§ 1202.4, subd. (g)), section 1203.2, subdivision (a), provides that a defendant's probation or supervision may not

17

Further, imposition of assessments and restitution fines on indigent defendants will not serve the purposes of funding the courts or the state restitution fund if they have no ability to pay.

Moreover, we disagree with the conclusion in *Hicks* that "[h]ow best to balance these competing interests—and what alternatives are best used to keep funding the courts and to continue providing some measure of restitution and solace to our state's crime victims—is a question to which . . . the federal and California Constitutions do not speak and thus have left to our Legislature." (*Hicks, supra*, 40 Cal.App.5th at p. 329.) As United States and California Supreme Court precedent affirm, the responsibility to protect the due process rights of indigent defendants in criminal proceedings is placed squarely on the courts. But we agree it is the proper role of the Legislature to address how best to fund the courts and provide restitution to victims of crime. We invite the Legislature to do so.[9]

---

be revoked for failure to pay victim restitution unless the court determines the defendant has the ability to pay.

[9] Assembly Bill No. 927, which was vetoed by the Governor, required a hearing on a defendant's ability to pay fines, fees, and assessments. (Assem. Bill No. 927 (2019-2020 Reg. Sess.).) The Governor clarified in his veto message that he agreed there is a need to "tackle the issue of burdensome fines, fees and assessments that disproportionately drag low-income individuals deeper into debt," but noted the issue needed to be addressed in the budget process to ensure adequate funding for the courts and victim compensation. (Governor's veto message to Assem. on Assem. Bill No. 927 (Oct. 9, 2019) Recess J. No. 14 (2019-2020 Reg. Sess.) p. 3651.)

18

To the extent *Hicks* relies on the rehabilitative goal of probation achieved by a defendant's payment of a fine, the purposes of the assessments and fines—to fund the courts and the state restitution fund, respectively—are not tied to the purposes of probation as described in *Hicks*. Finally, as to the concern in *Hicks* that considering a defendant's ability to pay amounts to inverse discrimination against affluent defendants, this equal protection approach fails to address the rights of indigent defendants to due process in their relationship with the courts that this court addressed in *Dueñas*. We believe the latter is the better analysis.

> b. *The constitutionality of imposition of fines and assessments should be analyzed under the due process clause instead of the Eighth Amendment*

In *Aviles,* the Fifth Appellate District concluded a challenge to imposition of fines and fees should be analyzed under the excessive fines clause of the Eighth Amendment, not a due process analysis under *Dueñas*. (*Aviles, supra*, 39 Cal.App.5th at pp. 1067-1069.) *Aviles* relies on *Timbs v. Indiana* (2019) ___ U.S. ____ [139 S.Ct. 682, 686-687] (*Timbs*), which affirmed that the Eighth Amendment's prohibition on excessive fines applies to the states as a result of its incorporation by the due process clause of the Fourteenth Amendment. The *Timbs* court also reaffirmed that the Eighth Amendment's prohibition on imposition of excessive fines "'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense."'" (*Timbs*, at p. 687, quoting *United States v. Bajakajian* (1998) 524 U.S. 321, 328 (*Bajakajian*).)

*Aviles* also relied on the California Supreme Court's opinion in *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*Lockyer*), which applied the four factors the *Bajakajian* court considered as part of its excessive fines analysis to determine the proportionality of the fine to the offense:  "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay."  The court in *Aviles* analyzed the first and second factors, concluding the fines and assessments were not grossly disproportionate to the culpability of the defendant, who had shot and wounded two police officers and stabbed his cellmate.  (*Aviles, supra*, 39 Cal.App.5th at p. 1072.)

We disagree with *Aviles*'s conclusion a constitutional challenge to imposition of fines and fees on an indigent defendant should be analyzed under an excessive fines analysis instead of a due process framework.  As the California Supreme Court explained in *Lockyer*, *supra*, 37 Cal.4th at page 728, in its analysis of the constitutionality of civil penalties imposed by the trial court, "It makes no difference whether we examine the issue as an excessive fine or a violation of due process."  Because both the *Dueñas* due process and *Lockyer* excessive fines analyses require consideration of a defendant's ability to pay, there is no need to analyze the constitutionality of fines and fees under the Eighth Amendment.

In addition, *Aviles* considered whether the court assessments were "excessive fines" despite the excessive fines clause's application only to the government's extraction of payments ""as punishment for some offense.""  (*Timbs, supra*, 139 S.Ct. at p. 687; see *Bajakajian, supra*, 524 U.S. at p. 334 ["[A]

punitive forfeiture violates the excessive fines clause if it is grossly disproportional to the gravity of a defendant's offense."].)[10]  As this court explained in *Dueñas*, the court assessments are not punitive, but instead are part of a comprehensive scheme imposing numerous fees in civil and criminal proceedings to fund California's courts.  (*Dueñas, supra*, 30 Cal.App.5th at p. 1165.)  *Aviles* acknowledges the assessments are not punitive but cites to language in *Dueñas* that the additional, "potentially devastating consequences" from imposition of the fees on indigent defendants transform the fees "'into *additional punishment*'" for indigent defendants.  (*Aviles, supra*, 39 Cal.App.5th at pp. 1071-1072, quoting *Dueñas*, at p. 1168.)  But the fact this court found a due process violation based on the unfair consequences from imposition of assessments does not transmute the assessments into fines imposed as punishment for the purposes of the excessive fines clause.[11]

[10]     The Court in *Timbs, supra*, 139 S.Ct. at page 689, cautioned that fines that are the source of revenue for the State must be scrutinized to ensure they are not excessive, quoting the language in *Harmelin v. Michigan* (1991) 501 U.S. 957, 979, footnote 9, that "it makes sense to scrutinize governmental action more closely when the State stands to benefit."  As the *Harmelin* court explained, "There is good reason to be concerned that fines, uniquely of all punishments, will be imposed in a measure out of accord with the penal goals of retribution and deterrence." (*Harmelin*, at p. 979, fn. 9.)

[11]     As discussed, the Fourth Appellate District in *Kopp* only applied an Eighth Amendment excessive fines analysis to the "punitive fines" at issue, including the restitution fine.  (*Kopp, supra*, 38 Cal.App.5th at pp. 96-97 & fn. 24.)

21

Application of an Eighth Amendment analysis to the minimum restitution fine is complicated by section 1202.4, subdivision (c), which prohibits a trial court in the first instance from considering a defendant's ability to pay the minimum restitution fine. A trial court facing an Eighth Amendment challenge to imposition of the minimum restitution fine could avoid the serious constitutional question raised, as this court held in *Dueñas* under a due process analysis, by staying execution of the fine until the People demonstrate the defendant has the ability to pay the fine. (*Dueñas, supra*, 30 Cal.App.5th at p. 1172.) By contrast, because section 1202.4, subdivision (d), requires the trial court to consider the defendant's inability to pay an amount in excess of the minimum fine, imposition of an amount above the minimum does not pose the same constitutional challenge (unless, of course, the fines imposed are excessive).

Finally, the excessive fines analysis employed by *Aviles* and other courts inexplicably ignores the fourth factor under *Lockyer*—the defendant's ability to pay. (*Lockyer, supra*, 37 Cal.4th at p. 728.) To the extent a trial or appellate court considers an Eighth Amendment challenge to restitution fines (whether to the minimum fine or an amount above the minimum), the analysis must include consideration of all four *Lockyer* factors, not just the two factors the *Aviles* court considered. (*Lockyer*, at p. 728; *Kopp, supra*, 38 Cal.App.5th at p. 97 [*Lockyer* factors "are the same four factors the superior court should apply if either appellant claims the punitive fines here are excessive."].) The factors considered by the *Aviles* court—the defendant's level of culpability and the harm he or she caused (*Aviles, supra*, 39 Cal.App.5th at p. 1072)—are often not

at issue with respect to a trial court's imposition of fines following a conviction. But the defendant's ability to pay is critical to the analysis, especially for the minimum restitution fine (currently $300) that must be imposed in every case regardless of the defendant's culpability and the defendant's ability to pay. (§ 1202.4, subd. (b)(1).)

2. *Belloso did not forfeit his arguments under* Dueñas

The People contend Belloso forfeited his objections to the trial court's imposition of the assessments and fines because he failed to object to their imposition at sentencing. However, at the time Belloso was sentenced, *Dueñas* had not yet been decided. As we explained in *People v. Castellano* (2019) 33 Cal.App.5th 485, 489 (*Castellano*) in rejecting this argument, "[N]o California court prior to *Dueñas* had held it was unconstitutional to impose fines, fees or assessments without a determination of the defendant's ability to pay. . . . When, as here, the defendant's challenge on direct appeal is based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial, reviewing courts have declined to find forfeiture." (Accord, *People v. Johnson* (2019) 35 Cal.App.5th 134, 137-138; *People v. Santos, supra*, 38 Cal.App.5th at pp. 931-932; contra, *People v. Ramirez* (2019) 40 Cal.App.5th 305, 312; *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 464; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153 (*Frandsen*).)[12] As in *Castellano*, we decline to find Belloso forfeited his constitutional

---

[12] On July 17, 2019 the California Supreme Court denied review in both *Castellano* (S255551) and *Frandsen* (S255714).

23

challenge to the imposition of the assessments and restitution fines.

### 3. *On remand Belloso is entitled to an opportunity to challenge imposition of the assessments and fines*

The People contend the record does not support a remand for an ability-to-pay hearing because Belloso failed to show in the trial court he did not have the financial ability to pay the assessments and fines and failed to show he lacked the future earning capacity to pay, including from wages he would earn while in prison. The only information in the record regarding Belloso's ability to pay at the time of sentencing is that he was 42 years old and had an unknown employment history.

The People are correct Belloso must in the first instance request an ability-to-pay hearing and present evidence of his inability to pay the assessments and fines. (*Castellano, supra,* 33 Cal.App.5th at p. 490.)[13] However, as discussed in the context of forfeiture, because Belloso was not aware of his ability to challenge the assessments and fines on due process and equal protection grounds, we conclude he should have that opportunity on remand.

We reject the People's additional contention Belloso has not shown a due process violation because he has not demonstrated adverse consequences from imposition of the assessments and fines. As we explained in *Castellano,* "the defendant need not present evidence of potential adverse consequences beyond the

---

[13] As noted, the Supreme Court's grant of review in *Kopp* includes the question of which party has the burden of proof to show a defendant's inability to pay.

24

fee or assessment itself, as the imposition of a fine on a defendant unable to pay it is sufficient detriment to trigger due process protections." (*Castellano, supra*, 33 Cal.App.5th at p. 490.)

## DISPOSITION

The conviction is affirmed.  We remand to allow Belloso to request a hearing and present evidence demonstrating his inability to pay the court facilities and court operations assessments, restitution fine, and parole revocation restitution fine.  If Belloso demonstrates his inability to pay the assessments, it must strike them.  If the trial court determines Belloso does not have the ability to pay the restitution fine and parole revocation restitution fine, it must stay execution of the fines.  On remand the trial court should correct the June 27, 2018 minute order to reflect Belloso only admitted the allegation he was convicted of a violent or serious felony under the three strikes law with respect to his 2013 conviction of making a criminal threat, not the alleged 1995 or 2013 assault convictions.


FEUER, J.

WE CONCUR:


PERLUSS, P. J.


ZELON, J.

25